Filed 1/27/21  P. v. Radloff CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMIE NICHOLE RADLOFF et al.,<br><br>    Defendants and Appellants. | D075891<br><br>(Super. Ct. No. SCN370158) |

APPEAL from judgments of the Superior Court of San Diego County, Carlos O. Armour, Judge.  Affirmed.

Michael Bacall, under appointment by the Court of Appeal, for Defendant and Appellant Jamie Nichole Radloff.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant Hector Samuel Galvez.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jamie Nichole Radloff and Hector Samuel Galvez, Jr. of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1); and robbery (§ 211; count 2). With respect to both counts, the jury found true allegations that Galvez intentionally and personally discharged a firearm (§ 12022.53, subd. (d)) and that Radloff was a principal who was vicariously liable (§ 12022, subd. (a)(1)). The jury also convicted Galvez of possessing a firearm as a prohibited person (§ 29800, subd. (a)(1); count 3). Galvez subsequently admitted a prior offense that constituted both a strike prior and a serious felony prior.

The court sentenced Radloff to 25 years to life for count 1 plus a consecutive one-year term for the special allegation. Under section 654, the court stayed Radloff's sentence on count 2 as well the special allegations related to that count.

The court sentenced Galvez to 50 years to life on count 1 (25 years to life, doubled due to the strike prior), plus an additional term of 25 years to life for the firearm allegation and an additional five-year term for the serious felony prior. Per section 654, the court stayed Galvez's sentence as to the remaining counts and true findings.

Both Radloff and Galvez timely appealed.

Radloff claims the trial court prejudicially erred by responding to the jury's question by providing language from CALCRIM No. 1603. She also contends there was insufficient evidence to convict of murder under the felony murder rule. We conclude neither contention has merit.

Galvez argues the matter must be remanded to allow the court the option of striking his serious felony prior conviction under Senate Bill No. 1393 (2017-2018 Reg. Sess.). However, Senate Bill No. 1393 was in effect

---

[1] Statutory references are to the Penal Code unless otherwise noted.

2

at the time Galvez was sentenced, and he did not ask the court to strike his prior under that provision. As such, he forfeited his objection here. Moreover, on the record before us, we do not conclude that Galvez has carried his burden in showing he received ineffective assistance of counsel.

Finding the arguments raised by Radloff and Galvez unpersuasive, we affirm the judgments.

## FACTUAL BACKGROUND

### Prosecution

Radloff was a drug user who sometimes prostituted herself for drugs or for money to buy drugs. Her boyfriend, Galvez, was a drug user and dealer. Radloff also bought or was given drugs from Joel B., who was like an uncle to Radloff, and although they were not related, they enjoyed a very close relationship.

Despite considering each other family, Joel and Radloff occasionally had sex, with Joel providing money or drugs to Radloff as part of the activity. About a year before Joel was killed, he had asked Radloff to have sex for money with two of his friends. However, when Radloff arrived for the encounter, she discovered that she was supposed to have sex with Joel and his friend. Joel and Radloff had sex multiple times after that experience.

The night before the shooting, Radloff and Galvez tried contacting Joel to arrange a meeting. Between 8:00 p.m. and 10:00 p.m., Radloff and Galvez went to Joel's trailer and to his ex-girlfriend's house, looking for him. Radloff had previously told Joel's ex-girlfriend about her sexual involvement with Joel. While Radloff and Galvez were at the ex-girlfriend's house, the ex-girlfriend told Radloff that she had confronted Joel about his sexual relationship with Radloff. Radloff was upset by this news because she did not want to discuss her relationship with Joel in front of Galvez.

3

Around 10:00 p.m. that same evening, Radloff texted Joel, purportedly looking for drugs. Joel texted back, asking Radloff who she was with. Although Radloff was with Galvez, she lied to Joel and said that she was with a female friend. During their text exchange, Joel confronted Radloff, asking her why she had told Joel's ex-girlfriend that Joel and another man had sex with Radloff, but Radloff was "saying no the whole time."

About an hour later, around 11:00 p.m., Joel met Radloff (who was with Galvez) outside of Joel's girlfriend's apartment complex in Oceanside. They talked outside for about 10 minutes. Radloff told Joel she wanted to buy a quarter pound of methamphetamine. Joel was upset that people were talking about his sexual relationship with Radloff, but he agreed to meet his supplier to get the drugs. When Joel came back inside, he asked to borrow his girlfriend's car to go buy drugs.

Shortly after 11:00 p.m., Joel drove to his supplier and picked up a quarter pound of methamphetamine. He agreed to pay $800 for the drugs, but he did not pay for them up front. Joel told his supplier that he was planning to meet up with Radloff later. Joel was upset and told his supplier there were "rumors" about Joel and Radloff having a sexual relationship.

After meeting with Joel, Radloff and Galvez drove back to Hemet. Around that same time, Galvez advertised on social media that he had a gun for sale. They then drove back to Oceanside, arriving just before 4:00 a.m. Joel was not there yet; so, Radloff and Galvez went into a convenience store to buy food and cigarettes. A few minutes later, Joel arrived back in Oceanside to meet with Radloff. He called his girlfriend to tell her he was back, but that he had to quickly meet with his niece before returning inside. Joel met with Radloff and Galvez by Galvez's car. According to Radloff, Joel told them that he had a quarter pound, but could only sell Radloff and Galvez

4

one ounce.  Joel said that he could get more from his supplier; he began calling her repeatedly, but she did not answer.  He then sent his supplier a text message, asking, "Can you get me another one?"  A few minutes later, Galvez took out his gun and pointed it at Joel, demanding money and drugs.  When Joel responded, "Fuck you," Galvez shot Joel three times—once in the stomach, once in the buttocks, and once in the arm.  Joel fell to the ground, screaming in pain and for help.

As Joel lay in the street, groaning in pain, Radloff started to slowly drive away.  Radloff then turned the car around, pulled up by Joel for 10 or 15 seconds, then drove away again.  About an hour and a half after the shooting, Galvez bragged on social media about robbing someone for drugs.

After hearing the gunshots, bystanders living in the apartment complex came outside to help.  They saw Joel laying in the street, trying to crawl toward the side of the road.  One of the bystanders asked what had happened, and Joel responded that his niece's boyfriend had shot him.

When police arrived at the scene, Joel was laying in the street screaming in pain and gasping for air.  Loose methamphetamine was scattered in the street as was the trash and food wrappers from the items Radloff and Galvez had purchased from the convenience store.  When police asked Joel who had shot him, he stated, "My niece knows who did it."  Joel lost consciousness shortly after the paramedics arrived at the scene.  He died at the hospital soon after.

During their investigation into Joel's murder, police viewed surveillance footage from the nearby convenience store and saw Radloff and Galvez purchasing the items that were later found littered near Joel's body.  Using cell phone data, police located Radloff and Galvez at a motel in Hemet.

An officer watching the motel saw Radloff leave the motel on foot and Galvez drive away in his car. Radloff and Galvez were separately arrested by police.

Police searched Galvez's car and found a gun in a hidden compartment. Ammunition for the gun as well as Galvez's cell phone was found inside the car. Galvez also had $1,184 cash on his person. A BB Airsoft pistol, an additional BB gun, BBs, and 9.2 grams of methamphetamine were found in Radloff's property. Subsequent DNA analysis found very strong support for inclusion of Galvez as a contributor to DNA found on the gun used in the shooting and limited support for exclusion of Radloff as a contributor.

When Radloff was arrested, she had methamphetamine on her that was in larger pieces, consistent with the type of methamphetamine that a dealer would have access to as opposed to a user. When Radloff was first interviewed by police, she initially denied that she or Galvez had any involvement in Joel's death. She discussed her relationship with Joel and told police that Joel was upset with her for telling his ex-girlfriend about their sexual relationship. She claimed that Joel had raped her when she was 11 years old.

According to Radloff, although Joel was "addicted" to her and wanted to have sex with her often, he denied it to other people and would speak badly about Radloff. Radloff claimed Joel was a gang member and alleged that he would get in trouble with his gang for having sex with Radloff. Later in the interview, Radloff described Joel as "vicious" and "a beast." She knew that he carried weapons on him like handguns, knives, and crowbars.

About midway through her interview, Radloff changed course and claimed that she had been the one to shoot Joel. She stated that she and Joel had gotten into an argument about their sexual involvement. She admitted that when she told Joel's ex-girlfriend about her sexual involvement with

Joel, she would "eventually . . . have to bite that bullet."  Radloff said that she told Joel that it made her feel bad to have sex with him, but he told her that she was not his "real" niece and they were not related by blood.  She also stated that Joel was upset that Radloff had brought Galvez with her to the meetup; he thought she would be alone.  Radloff said that she shot Joel during their argument.  She told the police that the gun she used to kill Joel belonged to her.  She took full responsibility for the shooting, telling police, "I'm responsible (unintelligible) what happened.  It's my fault.  Because . . . I brought the gun, it's my uncle, we're arguing and fighting."

Referring to Galvez, Radloff stated, "He doesn't know what . . . is going on.  He doesn't know that me and my uncle have this sick quarrel of drug and money and sex, and he don't even use dope.  He's just . . . there and we're in his car and . . . I just felt like I just put all of us in a bad, bad position."

However, later Radloff seemed to waver somewhat when police insisted that evidence pointed to Galvez as the shooter.  Although she never told police that Galvez was the shooter, she eventually stated that Galvez had stayed in the car and that, "Shots were fired from inside the car."

During a brief subsequent conversation with the officers, Radloff denied shooting Joel.

Defense

At trial, Radloff testified in her defense.  She claimed that she was "shocked" and "surprised" when Galvez shot Joel.  She testified that after Galvez shot Joel, he pointed his gun at Radloff and told her to "drive."  She was too scared of Galvez to get out of the car to try and help Joel.  Radloff claimed that when they got back to Hemet, they checked into a motel room, and Galvez told her that she needed to "take responsibility" for shooting Joel.  Galvez allegedly told her that if she did not, he was going to "visit [her]

7

family." Radloff claimed that when her sister called on the phone, Galvez made Radloff tell her that she had shot Joel. She was afraid to leave the motel room, even while Galvez was taking a shower, because she was fearful of what Galvez would do to her family.

On cross-examination, Radloff admitted to knowing that drug dealing was a dangerous business, and that it was unlikely for a drug dealer to sell drugs to someone (such as Galvez) that he did not know. She also admitted to knowing that Joel was not the type of person who would be taken advantage of and that she knew that Joel would fight back if necessary.

## DISCUSSION

## I

## JURY INSTRUCTIONS

### A. Radloff's Contentions

Radloff contends the trial court committed prejudicial error when it responded to a question from the jury seeking clarification as to when the requisite intent for robbery must be formed. The court responded to the question by providing the jury with a modified version of CALCRIM No. 1603. Radloff argues the instruction allowed the jury to wrongly convict her of felony murder, even if she only formed the intent to aid and abet the robbery after Galvez shot the victim.

### B. Background

Before closing arguments, among other things, the jury was instructed on the general principles of aiding and abetting. (CALCRIM Nos. 400, 401.) Specifically, the jury was instructed that to find a defendant guilty as an aider and abettor, the prosecution needed to prove that (1) the perpetrator committed the crime; (2) the defendant knew that the perpetrator intended to commit the crime; (3) before or during the commission of the crime, the

8

defendant intended to aid or abet the perpetrator in committing the crime; and (4) the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. (CALCRIM No. 401.) The jury was instructed that these principles of aiding and abetting did not apply to felony murder. (CALCRIM Nos. 400, 401.)

With respect to the murder charge, the jury was instructed that Radloff and Galvez were prosecuted under three separate theories of first degree murder, each of which had different requirements. (CALCRIM Nos. 548, 521.) The jury was told that the requirements for felony murder were set forth in CALCRIM No. 540, and it received such instructions.

With respect to robbery, the jury was instructed that the perpetrator needed to have used force or fear to take the victim's property, and that the perpetrator's intent to take the property must have been formed before or during the time that he or she used force or fear. (CALCRIM No. 1600.) The jury was told that if the perpetrator did not form the intent to take the property until after the use of force or fear, no robbery was committed. (See *ibid*.)

During deliberations, the jury sent the court a note with respect to Radloff's culpability for robbery:

> "We need clarification on the law in this case via the following question [¶] Radloff: What are our options on assigning guilt to Radloff should we not agree on intent or foreknowledge where the robbery is concerned? What is her culpability?"

The note then instructed the trial court to see paragraph 10 of Penal Code section 211 and asked, with respect to that paragraph: "What is the time span of 'during' in this paragraph (Beginning and End) and Radloff's culpability by the letter of the law?"

The trial court and the attorneys discussed how to respond to the jury's questions. The court stated the jury was likely confused because the paragraph of the robbery instruction mentioned in the note explained that the perpetrator's intent to take property must be formed before or "during" the use of force or fear, while the felony murder instruction provided that a robbery continues until the defendant reaches a place of temporary safety.

The prosecutor asserted that the timing of when an aider and abettor forms the requisite intent to aid and abet is different as to guilt for felony murder and guilt for robbery. As to felony murder, an aider and abettor must form the intent to aid and abet before the perpetrator uses force. But, as to robbery, an aider and abettor who intends to aid and abet in the asportation or flight (after the use of force or fear) may still be found guilty of robbery. The prosecutor pointed out that the jury had not been instructed with CALCRIM No. 1603, which explains the requisite intent of an aider and abettor to robbery.

The trial court agreed and suggested providing the jury with CALCRIM No. 1603. Radloff's trial counsel as well as Galvez's trial counsel both expressed concern that although CALCRIM No. 1603 applied to the substantive robbery offense, it did not apply to felony murder and should not be used by the jury as to the murder count. In response, the court pointed out that the jury's note did not mention felony murder. The court also suggested explicitly limiting the instruction's applicability to count 2, the robbery count.

Counsel for Radloff stated that he would like the opportunity to explain to the jury the distinction between liability for aiding and abetting a robbery and liability for felony murder. He also stated that his preference would be not to instruct the jury with CALCRIM No. 1603, but, instead, to tell them

10

that the intent must be formed before or during the use of force, and to apply the ordinary definition of "during."

To address the parties' concerns, the trial court suggested instructing with CALCRIM No. 1603, but explicitly telling the jury to apply the instruction to aider and abettor liability for count 2 only and not to the felony murder theory of murder. The prosecutor agreed. Radloff's trial counsel maintained that there was still a risk that the jury would wind up improperly applying the instruction as to felony murder by using CALCRIM No. 1603 as to robbery and then going on to improperly conclude that a robbery had been committed as to the felony murder analysis.

The trial court reiterated that the jury's question did not reference any confusion as to the felony murder count. Ultimately, the trial court provided the jury with the following response:

> "DO NOT USE THIS INSTRUCTION AS TO FELONY MURDER
>
> "To be guilty of Robbery as set forth in Count 2 as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety. ¶ A perpetrator has reached a place of temporary safety with the property if he or she has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property. ¶ See CALCRIM 540(a) and 540(b) for separate instructions on felony murder."

Later, after further deliberation, the jury sent out the following note: "Based on the way we read the instructions to the jury . . . (540B) [¶] Once we have agreed to Ms. Radloff's guilt in the ROBBERY[,] are we committed to finding her guilty of [first] degree murder OR can we choose [second] degree."

11

The trial court responded by telling the jury that if it found the defendant guilty of felony murder under either CALCRIM No. 540A or 540B, it was murder in the first degree.

## C. Analysis

Radloff contends that the trial court prejudicially erred in instructing the jury under CALCRIM No. 1603 because it allowed the jury to find that she was guilty of felony murder even if she did not aid and abet in the robbery until after Joel was shot. Radloff is mistaken.

To be guilty of felony murder, an accomplice must assist or encourage the commission of the underlying felony before the principal kills the victim. (*People v. Pulido* (1997) 15 Cal.4th 713, 726 (*Pulido*).) Thus, to be guilty of felony murder, Radloff must have intended to commit, or aid and abet the felony robbery of Joel before or at the time Joel was shot. (*People v. McDonald* (2015) 238 Cal.App.4th 16, 22-23, 25-26 (*McDonald*).) As we shall explain, the jury was so instructed.

The jury was instructed on felony murder, actual killer, in the language of CALCRIM No. 540A in pertinent part as follows:

> "The defendant is charged in Count 1 with murder, under a theory of felony murder. [¶] To prove that the defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant intended to commit or attempted to commit a robbery; [¶] 2. While committing or attempting to commit the robbery a defendant caused the death of another person; [¶] 3. The defendant was the actual killer [¶] The person who actually killed, may be guilty of felony murder even if the killing was unintentional, accidental or negligent. [¶] To decide whether the defendant committed or attempted to commit Robbery, please refer to the separate instructions that I will give you on that crime. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony

12

murder. [¶] The defendant must have intended to commit the felony of Robbery before or at the time that he or she caused the death. [¶] The crime of Robbery continues until a defendant has reached a place of temporary safety. [¶] It is not required that the person die immediately, as long as the act causing death occurred while the defendant was committing the felony." (CALCRIM No. 540A.)

The jury also was instructed on felony murder, another person causes death, in the language of CALCRIM No. 540B, in relevant part, as follows:

"The defendant may also be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the *perpetrator.* [¶] To prove the defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed or attempted to commit or aided and abetted a robbery; [¶] 2. The defendant intended to commit or intended to aid and abet the perpetrator in committing the robbery; [¶] 3. If the defendant did not personally commit or attempt to commit robbery, then a perpetrator, whom the defendant was aiding and abetting committed to attempted to commit a robbery; [¶] 4. While committing or attempting to commit robbery, the defendant or perpetrator caused the death of another person. [¶] 5. The defendant's participation in the robbery began before or during the killing; [¶] AND [¶] 6a) The defendant was not the actual killer, but, with the specific intent to kill, the defendant aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the killing; [¶] OR [¶] 6b) The defendant was a major participant in the robbery AND when the defendant participated in the robbery he or she acted with reckless indifference to human life."(CALCRIM No. 540B.)

The jury was further instructed under CALCRIM No. 540B that to determine whether the defendant and the perpetrator committed or attempted to commit robbery, and to determine whether the defendant aided and abetted the commission of robbery, it should refer to the separate

13

instructions on those topics. (See CALCRIM No. 540B.) The instruction also stated that "[t]he defendant must have intended to commit or aid and abet the felony of Robbery before or at the time that he or she caused the death." (See CALCRIM No. 540B.)

Notwithstanding the above instructions, Radloff contends that CALCRIM No. 1603 allowed the jury to find her guilty of felony murder even if she did not aid and abet in the robbery until after Joel was shot. The jury was instructed in the language of CALCRIM No. 1603 as follows: "To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety." In addition, the court modified CALCRIM No. 1603 to instruct the jury that it could not use the instruction to convict Radloff of felony murder and specifically referred the jury to CALCRIM Nos. 540A and 540B for felony murder.

Radloff was charged with aiding and abetting the robbery of Joel. In *People v. Cooper* (1991) 53 Cal.3d 1158, 1170, our Supreme Court held that when a defendant is charged with aiding and abetting a robbery, the court has a sua sponte duty to instruct the jury that "the commission of the crime of robbery is not confined to a fixed place or a limited period of time and continues so long as the stolen property is being carried away to a place of temporary safety." Thus, arguably, the trial court was required to instruct the jury in the language of CALCRIM No. 1603. In this case, it only did so when the jury expressed confusion as to the timing of Radloff's intent as it related to the robbery.

As Radloff points out, the bench notes to CALCRIM No. 1603 caution, "Do not give this instruction if the defendant is charged with felony murder."

(Bench Notes to CALCRIM No. 1603 (2020) p. 1139.) Bench notes, however, do not have the force of law (see *McDonald*, *supra*, 238 Cal.App.4th at p. 26), and no authority is cited in support of the note. In any event, we reject Radloff's assertion that CALCRIM No. 1603 conflicts with CALCRIM Nos. 540A and 540B as given in this case. CALCRIM Nos. 540A and 540B specifically pertain to felony murder and the jury was instructed consistent with those instructions that to be guilty of felony murder, "[t]he defendant must have intended to commit or aid and abet the felony of Robbery before or at the time that he or she caused the death." (See CALCRIM No. 540B.) On the other hand, CALCRIM No. 1603 provides that "[t]o be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety." CALCRIM No. 1603 does not address whether or under what circumstances a defendant could be guilty of felony murder. Further, in providing the jury with CALCRIM No. 1603, the jury was explicitly advised that it could not use CALCRIM No. 1603 to find Radloff guilty of felony murder.

Here, Radloff urges us to follow *Pulido*, *supra*, 15 Cal.4th 713 and *McDonald*, *supra*, 238 Cal.App.4th 16 and find the court improperly instructed the jury. Neither case is helpful to Radloff's position.

In *Pulido*, *supra*, 15 Cal.4th 713, the issue was whether a defendant could be liable for a felony murder committed before he aided and abetted the killer in the commission of a robbery. (*Id*. at p. 716.) Our high court answered the question in the negative because, in such a case, the "killer and accomplice were not 'jointly engaged at the time of such killing' in a robbery." (*Ibid*.) An accomplice's liability for felony murder is based on a homicide "committed in furtherance of a 'common purpose' [citation] or 'common

15

design' [citation] of robbery" and does not extend to "a killing that preceded any agreement or intent to participate in the robbery, because the killer was not then acting in pursuit of any such common design or purpose." (*Id.* at p. 722.)

The court, however, held the failure to instruct the jury that an aider and abettor cannot be convicted of a felony murder committed by another if the defendant only aided and abetted the robbery after the murder occurred did not require reversal because the issue was decided adversely to the defendant under other, proper instructions. (*Pulido, supra*, 15 Cal.4th at p. 716.) The jury in *Pulido* had been instructed it could not find the defendant guilty of the robbery-murder unless he was engaged in the robbery "at the time of the killing." In addition, the jury also had been instructed to determine whether the murder occurred " 'while the defendant was engaged or was an accomplice in' robbery. . . ." (*Id.* at p. 727, italics omitted.)

In the instant matter, we are not faced with an improper instruction like the one in *Pulido*. Here, the jury was properly instructed under CALCRIM No. 540B that an intent to aid and abet the robbery had to be formed before the killing occurred. As such, *Pulido* is not instructive in this matter.

In *McDonald*, the court held that the trial court erred in instructing the jury with CALCRIM No. 1603 and a truncated version of CALCRIM No. 540B because "[t]aken together, [those instructions] permitted defendant to be found guilty of felony murder even if he did not aid and abet the robbery until after commission of the act that caused [the victim's] death." (*McDonald, supra*, 238 Cal.App.4th at p. 27.) There, as in the present case, the trial court gave CALCRIM No. 1603 in conjunction with the instructions on robbery, and CALCRIM No. 540B in conjunction with the instructions on felony murder.

16

(*McDonald*, at pp. 21-22.) Unlike the present case, however, the trial court omitted the paragraph that would have told jurors " '[t]he defendant must have (intended to commit[,]/ [or] aid and abet[,]/ [or] been a member of a conspiracy to commit) the (felony/felonies) of _____ <insert felony or felonies from Pen. Code, § 189> before or at the time that (he/she) caused the death.]' " (*Id.* at pp. 22-23, italics omitted.) In concluding that the trial court erred in instructing the jury, the court found that "the omitted paragraph of CALCRIM No. 540B . . . was a correct statement of the law and was factually applicable to the present case. Although the record does not show defendant objected to its omission, we believe the trial court should have included it on its own motion, with a slight modification so that the final clause referred to the time the perpetrator (rather than the defendant) caused death." (*Id.* at p. 25.)

Here, unlike *McDonald*, the jury was instructed on the timing of an aider and abettor's formation of intent regarding felony murder. While the trial court did not modify the instruction to refer to the time the perpetrator (rather than the defendant) caused death, the meaning of the instruction was clear—to be guilty of felony murder, the defendant must have intended to commit or aid and abet in the felony robbery of Joel before or at the time Joel was shot. Further, in providing CALCRIM No. 1603, the court specifically told the jury it could not apply that instruction to felony murder. Accordingly, Radloff's claim that the trial court erred in instructing the jury on the crime of felony murder fails.

17

## II

## SUBSTANTIAL EVIDENCE

### A.  Radloff's Contentions

Radloff contends her murder conviction cannot stand because she was neither a major participant in the crime nor did her actions reflect a reckless indifference to human life.  She argues that substantial evidence does not support her conviction.

### B.  Standard of Review

We review a sufficiency of the evidence claim under the familiar and deferential substantial evidence standard of review.  (See *People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)  Substantial evidence is evidence that is "reasonable, credible, and of solid value."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  In reviewing for substantial evidence, we presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  (See *People v. Lee* (2011) 51 Cal.4th 620, 632.)  "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

"When a jury's verdict is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the

jury.  It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970, italics omitted.)  Whether the evidence presented at trial is direct or circumstantial, the relevant inquiry on appeal remains whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.  (See *People v. Manibusan* (2013) 58 Cal.4th 40, 92; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. (See *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1356.)

### C.  Analysis

Since the enactment of Senate Bill No. 1437 (2017-2018 Reg. Sess.), the felony murder statute now explicitly incorporates the requirements of the felony murder special circumstance.  (§ 189, subd. (e)(3); *People v. Solis* (2020) 46 Cal.App.5th 762, 775.)  Therefore, for felony murder liability to attach, a non-killer defendant who does not intend to kill must be a major participant in the underlying crime who acts with reckless indifference to human life. (§ 189, subd. (e)(3).)  The "major participant" and "reckless indifference" requirements codify the limits announced in *Tison v. Arizona* (1987) 481 U.S. 137.  (*People v. Estrada* (1995) 11 Cal.4th 568, 575.)  *Tison*, in turn, expanded upon *Enmund v. Florida* (1982) 458 U.S. 782.  (*People v. Banks* (2015) 61 Cal.4th 788, 799-802 (*Banks*).)

Here, Radloff argues that substantial evidence does not support the jury's finding that she was a major participant in the robbery or that she acted with a reckless indifference to human life.  We will analyze each of these issues separately.

19

As a threshold matter, we acknowledge there were competing narratives presented at trial regarding the meeting among Joel, Radloff, and Galvez. Radloff claimed she and Galvez were merely trying to buy drugs from Joel. The prosecution, however, argued Radloff and Galvez intended to rob Joel. It is not our role to reweigh the evidence supporting each theory of the case (see *People v. Nelson* (2011) 51 Cal.4th 198, 210), but, instead, for purposes of our analysis here, we review the evidence in light most favorable to the judgment to ascertain whether there is substantial evidence showing Radloff and Galvez intended to rob Joel (see *People v. Manibusan, supra,* 58 Cal.4th at p. 92).

Radloff and Galvez brought a loaded gun to the meeting with Joel. Further, Radloff initially told the police the gun was hers. There was ammunition for the gun found in Radloff's cell phone box. Also, Radloff lied to Joel about who she was with before their first meeting on the night in question. She told Joel she was with a female friend when she was actually with Galvez. The jury could infer from such evidence that Radloff did not want Joel to be prepared for Radloff to be accompanied by a male. Moreover, there was evidence proffered at trial that Radloff was in a dispute with Joel and had motive to hurt him. They were fighting about Radloff's decision to tell Joel's ex-girlfriend about their sexual relationship. Indeed, Radloff told the police that, when they met on the subject night, Joel was upset about the fact that Radloff disclosed the sexual nature of their relationship. Also, there was little evidence that Radloff expressed any shock or surprise when Joel was shot. In short, substantial evidence supports the prosecution's theory that Radloff and Galvez intended to rob Joel.

20

We next turn to whether substantial evidence supports a finding that Radloff was a "major participant" in the robbery. In doing so, we consider the following factors:

> "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?" (*Banks*, *supra*, 61 Cal.4th at p. 803.)

Here, there was substantial evidence that Radloff was at least somewhat involved in the planning of the robbery, was present at the scene of the crime, was in a position to facilitate or prevent Joel's murder, and her actions or inaction played a role in Joel's death. (*Banks*, *supra*, 61 Cal.4th at p. 803.)

In regard to planning the robbery, it is undisputed that Radloff contacted Joel to arrange the meeting. Radloff had a close relationship with Joel. In contrast, Galvez had never met Joel before he shot him. Put differently, Radloff selected the target of the robbery. As such, the first fact supports Radloff's role as a major participant. (See *People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1385 (*Gonzalez*) [the defendant's act of luring the victim to the scene of the crime was " 'critical to the robbery's success' "].)

Although Galvez shot Joel, there was significant evidence offered about Radloff's knowledge and use of guns. She initially told the police the gun used to kill Joel was hers. She provided details to the police about the gun and about shooting various types of guns. The ammunition for the gun used

21

to kill Joel was found in the car Radloff and Galvez were traveling in to meet Joel when he was shot.

Additionally, the evidence showed that Radloff had significant awareness as to the particular dangers posed by the nature of the crime, especially the violent nature of both Joel and Galvez. At trial, Radloff testified that she believed drug dealing was a dangerous business. She emphasized, during her interview with police as well as at trial, that she knew Joel was a violent person who would not tolerate being taken advantage of. (See *Gonzalez*, *supra*, 246 Cal.App.4th at p. 1385 [where the defendant knew that the proposed robbery victim was a drug dealer who had been physically violent in the past, there was "a substantial probability the robbery would result in resistance and the need to meet that resistance with deadly force"].) And Radloff acknowledged to the police that she was aware of Galvez's violent past. During her interview, the police told Radloff that Galvez "ha[d] this long history of violence, there's a lot of violence. A lot of guns, a lot of stuff in his background." Upon hearing this information, Radloff responded, "Yeah." The jury could reasonably infer that Radloff was indicating her awareness of Galvez's violent nature and use of guns.

Radloff also was present at the scene of the robbery. She was not merely the getaway driver who was offsite waiting for the robbery to be committed. "Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state.' " (*People v. Clark* (2016) 63 Cal.4th 522,

22

619 (*Clark*).) Further, "the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." (*Ibid.*)

In addition to her presences at the scene, Radloff was in a position to potentially prevent the actual murder, yet she did nothing. According to Radloff's trial testimony, Galvez suddenly decided to rob Joel by pointing a gun at him and demanding the drugs and the money. Joel responded by saying, "Fuck you," and then tried to escape before Galvez shot him three times. However, when Galvez first pointed the gun at Joel, there is no evidence that Radloff did anything in response. She did not try to stop Galvez. Although she knew both Joel and Galvez, she did not attempt to deescalate the situation. In fact, there was no evidence that Radloff was surprised by Galvez's actions whatsoever. She did not protest. She did not yell at Galvez to stop. She did not tell Joel to wait and not try to run away. In short, she took no effort to ensure that Galvez did not shoot Joel. Again, this evidence supports the jury's finding that Radloff was a major participant. (See *In re Loza* (2017) 10 Cal.App.5th 38, 51.)

Finally, Radloff's actions after Joel was shot further support that she was a major participant. After witnessing Joel being shot three times, lying in the street, and screaming in agony, Radloff did nothing to help him. She did not get out of the car. She did not render aid. She did not ask anyone else for help. She did not call the police or an ambulance. Instead of helping Joel, she chose to aid Galvez in escaping. (See *In re Loza, supra,* 10 Cal.App.5th at p. 51 [substantial evidence that the defendant was a major participant where the defendant helped the perpetrator to leave the scene after the shooting and fled with the perpetrator].) And the jury, as the trier

23

of fact, was in the best position to evaluate the credibility of Radloff's claim that she drove away out of fear of Galvez. Again, there was no evidence that Radloff expressed surprise or shock when Joel was shot. Also, although Radloff claimed that Galvez pointed the gun at her and demanded that she drive away, Radloff did not immediately leave, but rather started to drive slowly away then circled back toward Joel for several moments before slowly driving away. Certainly it was reasonable for the jury to find that if Galvez was actually threatening Radloff, Radloff would have left quickly and not circled back toward Joel.

Here, Radloff does not address the evidence showing she was a major participant in the robbery. Instead, she points at other evidence she claims shows that she did not know Galvez was going to rob Joel and that she acted under Galvez's threats to harm her. In this sense, Radloff is simply asking us to reweigh the evidence. This we cannot do. (See *People v. Nelson*, *supra*, 51 Cal.4th at p. 210.) We must look at the evidence in a light most favorable to the judgment. (See *People v. Rivera* (2019) 7 Cal.5th 306, 323-324.) Through this lens, we are satisfied that substantial evidence supports the jury's finding that Radloff was a major participant in the robbery.

Having concluded that substantial evidence supports the finding that Radloff was a major participant, we next analyze whether substantial evidence supports the finding that Radloff acted with a "reckless indifference to human life." The phrase "reckless indifference to human life" does not have any special meaning under the law, and simply requires that the defendant be subjectively aware that the criminal activity that he or she is participating in involves a grave risk of death. (*People v. Mil* (2012) 53 Cal.4th 400, 417; *People v. Estrada*, *supra*, 11 Cal.4th at p. 577.) As our high court recognized, there is " 'significant[ ] overlap' " with respect to the factors

24

concerning major participation. (*Clark, supra*, 63 Cal.4th. at p. 615.) As such, "the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life." (*Ibid*.)

Like her argument that substantial evidence does not support a finding that she was a major participant in the robbery, Radloff again focuses only on the evidence that supports her position and ignores the contrary evidence. As such, we summarily reject this argument as improper for a substantial evidence challenge. (See *People v. Rivera, supra*, 7 Cal.5th at p. 323-324; *People v. Maury, supra*, 30 Cal.4th at p. 403; *People v. Brown, supra*, 150 Cal.App.3d at p. 970.)

Here, application of the *Clark* factors to Radloff's conduct shows that she acted with reckless indifference. With respect to her knowledge that a gun would be used, again, she told police that the gun belonged to her, and the ammunition for the gun was found in the car she traveled in with Galvez on the night Joel was killed. Even if the gun belonged to Galvez, there was evidence that she knew he had it. Although simple awareness that a cohort is armed does not by itself establish reckless indifference, it is still a factor in the calculus. (*Clark, supra*, 63 Cal.4th at p. 618.)

Radloff also planned a crime that, by its very nature, involved a high risk of danger. Here, there is evidence that Radloff knew that her targeted victim was dangerous (she described him as "vicious" and "a beast"). By choosing to rob a drug dealer in front of an apartment complex, where bystanders could be present and at risk of being shot, Radloff demonstrated reckless indifference to human life. Radloff also indicated awareness of Galvez's violent history.

Additionally, Radloff took action to increase the level of danger in the robbery of Joel. In her police interview, she stated that she was the one who

25

brought up the topic of her sexual involvement with Joel during their meeting. The discussion of her possibly unwilling sexual involvement with Joel and another man upset Joel and only increased the tension and risk of danger.

Radloff was present at the scene of the robbery, witnessed the shooting, and then took no action to help Joel; this also is highly probative of her reckless indifference. Because Radloff was physically present at the scene of the murder, she had the opportunity to restrain the murderer or aid the victim, yet she did neither. (See *People v. Garcia* (2020) 46 Cal.App.5th 123, 148 ["Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry."].)

After Joel was shot, he fell to the ground and began screaming for help. Radloff did not get out of the car to render any aid to Joel, and she did not call 911 or ask anyone else to help Joel. Instead, she slowly started to drive away, then circled back to Joel, then slowly drove away with Galvez. Her actions, again, demonstrated reckless indifference. (See *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1117[2] ["After hearing what [the defendant] knew was a gunshot, she failed to help the victim or call 911. Instead she went to [a] house and stayed with [her accomplices] for the rest of the night . . . . Her actions reflect utter indifference to the victim's life."]; *People v. Smith* (2005) 135 Cal.App.4th 914, 927-928 [the defendant acted

---

[2] We note our high court disapproved of *People v. Lopez, supra,* 198 Cal.App.4th 1106 to the extent it holds the knowledge of one's accomplice is armed can, by itself, establish reckless indifference to human life under section 190.2, subdivision (d). (See *Banks, supra,* 61 Cal.4th at p. 809, fn. 8.) As the Supreme Court observed, there was other evidence in the record that supported the jury's finding that the defendant acted with reckless indifference to life. (*Ibid.*) We emphasize that we are not relying on *Lopez* for the proposition that a defendant simply knowing an accomplice is armed is sufficient, by itself, to establish reckless indifference to human life.

with reckless indifference to human life where he knew the victim was injured and chose to flee with the killer rather than come to the victim's aid or summon help].)

Although she ignores the evidence supporting the jury's finding that she exhibited reckless indifference to human life, Radloff claims her case is analogous to *In re Bennett* (2018) 26 Cal.App.5th 1002 (*Bennett*). That case is no help to Radloff.

In *Bennett*, the petitioner participated in the planning of a robbery, which resulted in the shooting of the victim. He had a preexisting relationship with the victim, contacted and located the victim, and drove the other two participants to the victim's apartment. He also called the victim and lured the victim out of his apartment. (*Bennett*, *supra*, 26 Cal.App.5th at pp. 1019-1020.) There was also evidence that the petitioner knew the other two participants were armed. (*Id.* at p. 1020.) However, the petitioner was not aware of the violent nature of the other two participants. (*Ibid.*)

Yet, the petitioner " ' did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance.' " (*Bennett*, *supra*, 26 Cal.App.5th at p. 1023.) He was not " 'aware of and willingly involved in the violent manner in which the particular offense [was] committed. . . .' " (*Ibid.*) Consequently, the appellate court determined that substantial evidence did not support a finding that the petitioner had exhibited reckless indifference to human life. (*Id.* at p. 1026.)

In contrast to the petitioner in *Bennett*, here, there was evidence supporting the inference that Radloff knew Galvez was violent. In addition, unlike the petitioner in *Bennett*, Radloff was present at the scene when the shooting occurred, did not do anything to stop the shooting from happening,

and did not render aid or ask anyone to help after Joel was shot.  Simply put, Radloff's role in the robbery was much more involved than that of the petitioner in *Bennett*.  Thus, *Bennett*, *supra*, 26 Cal.App.5th 1002 is not instructive here.

In short, substantial evidence supports the finding that Radloff was a major participant in the robbery and exhibited a reckless indifference to human life.

## III

## THE FIVE YEAR ENHANCEMENT IMPOSED ON GALVEZ[3]

### A. Galvez's Contentions

Galvez argues that we must remand his case to allow the trial court the opportunity to consider whether to strike his serious felony prior conviction, which resulted in a term of five years being added to his sentence. To this end, he contends that, under Senate Bill No. 1393, he was entitled to have the trial court consider exercising its discretion to strike the enhancement. Acknowledging that he made no such request although Senate Bill No. 1393 was effective at the time of his sentencing, Galvez asserts his attorney was constitutionally ineffective for failing to ask the court to strike the prior series felony.

### B. Background

At the April 24, 2019 hearing during which Galvez admitted his serious felony prior conviction, the trial court inquired as to whether Galvez would be admitting "only" to the strike prior, or whether he would also be admitting to the alleged prison priors and the alleged serious felony prior. The court also noted that the serious felony prior was based on the same conduct as the strike prior: "A serious felony, which is the same as a strike prior." In

---

[3]     Although Galvez, in his opening brief, joined in the arguments advanced by Radloff, he did not supply any additional argument on any of the issues raised by Radloff. Joinder may be broadly permitted (Cal. Rules of Court, rule 8.200(a)(5)), but each appellant has the burden of demonstrating error and prejudice. (*People v. Coley* (1997) 52 Cal.App.4th 964, 972; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice."].) Because all of Radloff's arguments on appeal are based on her unique role in the underlying crimes, we do not see how they apply to Galvez.

response, Galvez's trial counsel stated that, "whether or not the strike prior served as a serious felony prior . . . or it will be used as a serious felony prior . . . it's within the discretion of the court under current case law. So I don't think we even have to admit to that, per se. [¶] However, by operation of law, we are admitting to the strike prior. How the court should receive it is something that we can address at sentencing."

The court then noted that "[t]he underlying charges for the serious felony prior are the same as the strike prior" and then confirmed that Galvez was "going to admit to the strike and the serious felony prior[.]"

Before the trial court took Galvez's admission, it advised Galvez that the strike prior "will double any base term on any charge that you have suffered," while the serious felony prior "has a possibility of adding five years to any total period of incarceration that you may suffer." Galvez indicated that he understood what the court was stating. The court then found that Galvez "made a voluntary, knowing and intelligent waiver as far as his rights to trial, which he previously waived, and his acknowledgement of the consequences of his admission to the serious felony prior and the strike prior."

At Galvez's subsequent sentencing hearing, Galvez's trial counsel asked the trial court to strike Galvez's strike prior and to exercise its discretion with respect to the gun-use allegation, but did not ask the court to strike Galvez's serious felony prior conviction. After declining to strike Galvez's strike prior and declining to impose a lesser term for the gun-use allegation, the trial court stated that it would "also impose the serious felony prior under [section] 667(a) for five years."

The trial court then went on to strike the sentence for the serious felony prior conviction as to count 2, the robbery conviction. The trial court

30

stated that while it was imposing the five-year enhancement as to the murder count, it was striking it as to the robbery count. In doing so, the trial court indicated that probation recommended imposing punishment for the serious felony prior conviction on both counts, but that the trial court would "strike that [section] 667(a) allegation as to the [section] 211." Upon request for clarification from defense counsel, the court later reiterated that it was "striking the nickel prior" for purposes of count 2.

## C. Analysis

Effective January 1, 2019, Senate Bill No. 1393 (2017-2018 Reg. Sess.) amended sections 667, subdivision (a)(1), and 1385, subdivision (b), to give trial courts the discretion to dismiss five-year serious felony sentence enhancements under section 667, subdivision (a). Galvez's sentencing took place on June 19, 2019. Therefore, at Galvez's sentencing, Senate Bill No. 1393 was already in effect, and the trial court had discretion to strike his five-year serious felony prior. Galvez, however, did not explicitly ask the trial court to do so. Because he did not, he has forfeited the issue on appeal. (See *People v. Carmony* (2004) 33 Cal.4th 367, 375-376 ["any failure on the part of a defendant to invite the court to dismiss under section 1385 . . . waives or forfeits his or her right to raise the issue on appeal"].)

To avoid forfeiture, Galvez claims that his trial counsel's failure to ask the trial court to strike his serious felony prior conviction enhancement constituted ineffective assistance of counsel.

To demonstrate ineffective assistance of counsel, Galvez must demonstrate his trial attorney's performance (1) fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) We evaluate the attorney's conduct with deference, and

31

we "indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance." (*People v. Dennis* (1998) 17 Cal.4th 468, 541.)

" ' "[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; *People v. Cash* (2002) 28 Cal.4th 703, 734 [" ' " 'record must affirmatively disclose the lack of rational tactical purpose for challenged act or omission.' [Citation.]" ' "].)

Here, the record does not indicate why Galvez's trial counsel failed to ask for the serious felony prior to be stricken. Perhaps defense counsel may have believed that her earlier comments acknowledging the court's discretion under Senate Bill No. 1393 and the trial court's earlier comments acknowledging the same were sufficient to bring the matter before the trial court. Alternatively, counsel made the tactical choice to focus on convincing the trial court to strike Galvez's strike prior or to impose a lesser punishment for the gun use enhancement, either of which (if successful) would have had a greater impact on Galvez's overall sentence. On the record before us, we cannot say that there was no tactical reason for defense counsel's choice not to request the court to strike Galvez's serious felony prior.

In addition, even if Galvez could meet the first prong of the test for ineffective assistance of counsel, he cannot meet his burden to show he "suffered prejudice to a reasonable probability." (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) The record demonstrates that the trial court was aware of its discretion to strike the five-year enhancement, should it have seen fit to do so. When the trial court accepted Galvez's admission to his strike prior, it

32

also addressed Galvez's serious felony prior conviction (which was based on the same underlying conduct) and noted that it had "a possibility" of adding five years to Galvez's sentence. At sentencing, the trial court stated that it would "also impose the serious felony prior conviction," again indicating through its language that its decision to impose punishment was not mandatory. Finally, and perhaps most significantly, the trial court actually struck the prior serious felony as to the robbery count. The trial court indicated that probation recommended imposing punishment for the serious felony prior conviction on both counts, but that the trial court would "strike that [section] 667(a) allegation as to the [section] 211." Thus, not only was the court aware of its discretion to strike serious felony prior convictions, it exercised its discretion to do so in this case. And, it did so without a corresponding request by trial counsel. Had the court wanted to exercise that discretion with respect to the murder count, the record suggests that it would have done so, even without a request from counsel.

In addition, the trial court's discretionary choices not to strike Galvez's strike prior and to impose the greatest possible term for the firearm enhancement also demonstrate a lack of prejudice as to the serious felony prior conviction enhancement. At sentencing, when the trial court denied Galvez's motion to strike his prior strike conviction, the trial court noted that the prior conviction (which also formed the basis of the serious felony prior conviction) was recent and involved firearms. The court stated its opinion that "there's nothing for the Court really to consider here as far as striking the strike that is of any benefit to [Galvez]."

Further, with respect to Galvez's firearm enhancement term, the court stated that "[b]ased on the circumstances of this case, the cold-blooded nature of this case, [and] the Defendant's history with weapons," it would not reduce

or strike the enhancement term. The court stated it "will not reduce the [section] 12022.53(d) to any lesser offense. I will not strike it. I will impose it fully at 25 years to life." Immediately after that, the court went on to state that it "will impose the serious felony prior under [section] 667(a) for five years." In light of the trial court's comments, there is no substantial probability that the court would have ignored all of those factors (including the recency of the prior conviction and the "cold-blooded" murder in this case) to strike the five-year enhancement.

Accordingly, Galvez's claim that his trial counsel was constitutionally ineffective fails.

## DISPOSTION

The judgments are affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

GUERRERO, J.